IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOHN D. JOY

       Plaintiff,

                                      3:11-cv-00743-PK

                                       FINDINGS AND
                                       RECOMMENDATION

v.

AGC-INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 701
DEFINED PENSION BENEFIT PLAN
             Defendant.

PAPAK, Judge:

       Plaintiff John Joy filed this ERISA action to challenge the denial of disability retirement

benefits by defendant AGC-International Union of Operating Engineers Local 701 Defined

Pension Benefit Plan ("the Plan"). This court has jurisdiction under 29 U.S.C. § 1132(e). The

parties' cross motions for summary judgment are now before the court. (#14, #16.) Plaintiff's

motion for summary judgment (#14) should be granted and defendant's motion for summary

judgment (#16) should be denied, for the reasons set forth below.

Page 1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

### I.    The Plan

John Joy was employed for approximately 35 years as a bulldozer operator before he stopped working in 2008 due to a variety of physical and mental conditions.   Joy was a member of the Operating Engineers union, which participated in AGC-International Union of Operating Engineers Local 701 Defined Pension Benefit Plan, an ERISA defined benefits pension plan. The Plan is funded by contributions from multiple employers and is maintained under collective bargaining agreements between employers and the union.   The Plan is maintained and administered by a joint labor and management Board of Trustees, consisting of four union trustees and four employer trustees.   The Board of Trustees exercises discretionary and final authority in interpreting the Plan and granting or denying benefits under the Plan, including reviewing disability claims and appeals.   (Taylor Decl., #10, Ex. 2 at 76.)

According to the summary of the Plan, to be eligible for disability benefits, one must: (1) have been earning covered hours of employment at the time the disability occurred; (2) not yet be eligible for normal retirement; (3) not yet have retired; and (4) submit satisfactory proof to the Trustees that the disability is "total and permanent."   (Taylor Decl. #10, Ex. 1, at 53.)   In turn, Plan language itself defines "Total and Permanent Disability" and describes the Trustees' application of that definition:

> For purposes of this Plan, "Total and Permanent Disability" is disability by bodily injury, disease, or mental disorder which, on the basis of medical evidence, is found by the Trustees to be permanent and continuous during the remainder of the Participant's lifetime, and which will render the Participant incapable of any regular employment or occupation substantially gainful in character.   The determination of a Participant's initial or continuing Total and Permanent Disability shall be at the sole discretion of the Trustees based upon such evidence or upon such guidelines as the Trustees shall deem

relevant for the determination of Total and Permanent Disability. The Trustees, at their discretion, may consider a Participant to have a Total and Permanent Disability if he or she has been deemed eligible and is entitled to Disability Insurance benefits under the Federal Social Security Act. A Total and Permanent Disability will not be considered established until it has continued for a period of six consecutive months. It shall be the responsibility of the Participant to submit proof of disability satisfactory to the Trustees. Before ruling on the Total and Permanent Disability of a Participant, the Trustees may designate a physician to examine the Participant. In addition, the Trustees may require proof of continued disability from time to time.

(Taylor Decl., #10, Ex. 2, at 62.)

## II.    Joy's Background

Joy began work as a bulldozer operator after leaving high school in around 1966 at the age of 16. (Taylor Decl., #10, Ex. 3, at 144)[1]. Between 1984 and 2006, Joy experienced a number of physical and psychological problems. Joy's physical problems included knee injuries and surgeries (AR 280-284, 286), lower back injuries and surgeries (AR 301-304, 328), back spasms (AR 327), drop foot and decreased sensation in the left foot (AR 331, 334), bladder cancer and chemotherapy (AR 334), gall bladder removal (AR 345-348), and hiatal hernia and peptic problems (AR 348). Joy's mental health was also unstable, with ongoing depression (AR 377), suicidal ideation and uncontrollable rage towards his family in the late 1980s (AR 296), and a reported civil commitment in the early 1990s (AR 143).

## III.    Precipitating Physical Injury

For three days in late April 2008, Joy operated a bulldozer to clear a landslide on a steep embankment of approximately 30-45 degrees. AR 366, 370. Because of the incline, the bulldozer was tethered to a hoist from above and repeatedly raised and lowered, a practice

---

[1] Hereinafter, Exhibit 3 of the declaration of Cornelia Taylor will be referenced only as "AR" (the Administrative Record) followed by the page number appearing at the bottom-left of every page.

described as "yo-yoing." *Id.* Joy was effectively suspended by his lap belt during this period, causing bruising on his abdomen. AR. 366, 378. At one point while suspended, Joy's arm went numb. AR 370. Joy reported that a lap belt is not standard restraint rigging for this procedure and a 5-point harness is more typically used for this type of work. AR 366.

On May 6, 2008, Joy developed rectal bleeding and a hemorrhoid. AR 366. His primary care provider, Dr. Fabers, surgically removed one clot, which initially reduced the discomfort. AR 366, 370. Later that evening, however, the pain and rectal bleeding returned, and Joy went to the emergency room. AR 366. Joy underwent a procedure to reduce the size of the hemorrhoid and was scheduled to consult with a surgeon for more treatment. AR 368. The next day, before the scheduled appointment, Joy came back to the hospital with increased pain and was found to have a "very prominent mixed internal/external thrombosed hemorrhoid." AR 371. Joy had surgery to remove part of the hemorrhoid, but continued having considerable discomfort a week later. AR 373, 376.

IV.   **Continued Effects From Injury and Mental Health Issues**

Joy apparently continued working and in mid-June 2008 sought out treatment for depression, reporting that he had depressed most of his life, sometimes worse than others. AR 377. He and his wife had been separated since 2005 and he expected they would divorce. *Id*; AR 133. In August 2008, Joy reported continuing abdominal pain for the last several months, but a colonoscopy revealed only mild internal hemorrhoids. AR 380. In October 2008, Joy found out that his wife had a new boyfriend and threatened her with a gun. AR 143. He retreated to his house and engaged in a 12-hour standoff with police and a SWAT team, remaining in his house for three hours after it had been filled with tear gas. *Id.* After finally

giving himself up, Joy was hospitalized. *Id.* He later explained that for several days before threatening his wife, he had heard auditory hallucinations of a little girl's voice in his house. *Id.* at 144.   In December 2008, while criminal charges were pending, Joy entered counseling with Clatsop Behavioral Healthcare.  His clinician, Garrison Nutt, M.Ed., initially diagnosed Joy with "Dysthmic Discover, provisional" and "Major Depressive Disorder, recurrent, moderate, provisional."  Tr. 149.   He continued seeing Nutt and other counselors at Clatsop Behavioral Healthcare regularly.  AR 147-264.

In March 2009, Joy underwent a psychiatric medication evaluation by Irene Holland, a psychiatric nurse practitioner, who found that Joy had moderate-to-severe symptoms of depression, trouble concentrating, and several suicidal thoughts daily, which Joy reported made it very difficult for him to get along at work, take care of things at home, or get along with other people. Tr. 145.  By then, Joy had apparently been sentenced to three years probation. Tr. 144. Holland diagnosed Joy with "Major depressive disorder recurrent moderate[;] Posttraumatic stress disorder, chronic, provisional[;] Intermittent explosive disorder [;] Mood disorder, NOS [;] and Attention deficit and hyperactivity disorder predominantly hyperactive impulsive type" and a GAF score of 50. AR 145.  Holland also indicated, among other stressors, Joy had lost employment due to legal problems. AR 145.

## V.    Disability Retirement Application

On June 25, 2009, Joy applied for disability retirement under the Plan.  AR 11.   On July 3, 2009, he filled out a Pension Questionnaire, listing the nature of his disability as "mental health/physical."  AR 17.

## VI.   Fecal Incontinence

Page 5 - FINDINGS AND RECOMMENDATION

A few days later, on June 29 2009, a little over a year after his initial injury and resulting

rectal problems, Joy visited Dr. Bascom for an initial consultation about fecal incontinence. AR

391. Joy reported that since his hemorrhoid surgery in 2008, he had "difficulty with leakage of

fecal material," which had "become such a problem that he now only does jobs where he is not

around the people [sic] because he feels humiliated by the odor and soiling." *Id.* Dr. Bascom

found "obvious weakness of the sphincter with deformity noted anteriorly on the left-side and a

keyhole deformity" and opined that although it was a "very severe defect," Joy had several

options to improve his quality of life, such as an artificial sphincter. AR 393 -394. Dr. Bascom

referred Joy to Dr. Patrick Lee for a further anal physiologic work-up. *Id.*  On July 9, 2009, Joy

reported to Dr. Lee that he was incontinent to "liquid stool and flatus," that his incontinence

symptoms were daily and without warning, and that he used toilet paper for protection at times,

but not diapers. AR 396. His bowel movements were once per day, and without pain. *Id.* Dr.

Lee examined Joy, noting "a minimal amount of external hemorrhoidal disease" and "some

mixed hemorrhoidal disease within the anal canal without significant rectal mucosal prolapse."

*Id.* Dr. Lee opined that Joy's history was suggestive of neuropathic fecal incontinence and

recommended further testing. *Id.*

## VII.    Social Security Disability Review

In September 2009, Joy underwent a psychodiagnostic evaluation by Daryl Birney, Ph.D.

at the request of Disability Determination Services to help determine Joy's eligibility for Social

Security disability benefits. Dr. Birney deemed Joy "difficult to diagnose" because he could not

get a clear history of Joy's mental and emotional functioning. AR 425. Dr. Birney noted that Joy

had symptoms of ADHD and that his concentration and attention were compromised, but that he

worked successfully for many years and was capable of managing funds. Birney diagnosed

Mood Disorder, NOS; ADHD, Predominantly Inattentive Type; and Cognitive Disorder, NOS,

with a GAF score of 50. AR 426.

**VIII.   Initial Submission of Evidence and Plan Responses**

In October, 2009, Dr. Lee's submitted a form to the Plan entitled "Attending Physician's

Statement" indicating Joy had a diagnosis of fecal incontinence, with progressive symptoms,

rendering Joy totally and permanently disabled and preventing him from performing his

occupation. AR 25. Dr. Lee noted, however that he did not "know what is involved in [Joy's]

profession." *Id.* Dr. Lee also indicated that the disability would likely continue for Joy's lifetime

or an indefinite duration. *Id.*

The next month, on November 10, 2009, Dr. Skip Freedman, M.D., Executive Medical

Director of AllMed Healthcare Management, completed a one-page "Independent Medical

Review" for the Plan. AR 41. The type of review requested was "In House Review Disability

Determination." *Id.* Dr. Freedman reviewed only the "Clinical Note" from Dr. Lee – ostensibly

the note from the July 9, 2009 visit– summarizing it as follows:  "The patient had fecal

incontinence. Per the July 2009 note, the patient had near normal anatomy and only once per day

stooling. The patient needs to be close to the restroom."[2] *Id.* Dr. Freedman responded that Joy

"is not totally disabled if he can work in an office proximate to the restroom based on what is

present in the note from three months ago." *Id.*

A few days later, Joy submitted documentation to the Plan showing Social Security had

---

[2] Interestingly, Dr. Freedman's summary seems to ignore that Joy reported incontinence
"without warning" to Dr. Lee and that Dr. Lee's progress note makes no mention of Joy needing
to be close to a restroom.

found him disabled and awarded benefits starting from March 2009.  AR 43.

The next month, Garrison Nutt, Joy's counselor, wrote a letter to the Plan on behalf of Joy in which he expressed concern that the Plan's denial of disability pension benefits was exacerbating his anxiety and depression.  AR 62.  Nutt wrote that Joy's perception that he would not be able to work again because of his job-related injuries in combination with the disability pension denial had contributed to significant increases in Joy's anxiety and stress and that "[t]he longer this situation continues, the more emotional and corresponding physical damage will likely be generated for him."  *Id.*  The Plan requested Dr. Freedman review only the letter from Nutt and advise whether Joy now met the Plan's requirement for total and permanent disability. AR 63.  On December 17, 2009, Dr. Freedman stated that Nutt's letter did not substantially change his prior determination because Nutt's letter indicated that "the patient's concern over not working and not receiving disability [] is worsening his psychological issues, not an intrinsic change in his mental issues."  *Id.*

## IX.    Rectal Diagnostic Testing and Plan Response

On January 8, 2010, Dr. Lee performed four anorectal diagnostic procedures– anorectal manometry, anal sensory EMG, pudendal nerve terminal motor latency, and endorectal ultrasound.  AR 407- 409.  Dr. Lee noted that "the current findings suggest an insensate rectum which may be contributing to [Joy's] incontinence."  AR 407.  In a follow-up visit, Dr. Lee recommended that Joy use fiber supplements and warm-water enemas to improve his incontinence, rather than a surgical intervention.  AR 420.  A few weeks later, on January 28, 2010, the Plan asked board-certified gastroenterologist Steven Tawil, M.D., of AllMed, to perform a "Medical Necessity of Disability Review."  AR 65-67.  Dr. Tawil stated that he

reviewed "[a]ll material submitted . . . including progress notes, disability claim form, and an

operative note," but gave no further specificity concerning the materials reviewed. AR 65. Dr.

Tawil noted that the submitted documentation showed Joy had not failed treatment for

incontinence, had not used medicines or injectable biomaterials, had not undergone anorectal

manometry[3], had not attempted biofeedback, and had not failed sphincter repair. AR 66. Thus,

Dr. Tawil concluded that without documented treatment measures for incontinence, Joy could

not be considered permanently disabled. *Id.* Moreover, Dr. Tawil commented that "[a]n adult

can wear diapers and can perform work despite the decrease in quality of life due to secretion of

feces from the anus." *Id.*

## X.    Initial Plan Denial

On the same day as Dr. Tawil's review, two members of the Plan's Trustee Committee,

Mark Holliday and Charles Valentine, recommended denying Joy's disability retirement

application. The entirety of the Committee's reasoning provides: "We recommend denial of Mr.

Joy's application for disability retirement on the basis that the trust physician[4] has stated that Mr.

Joy is not totally disabled. The file was also reviewed by the trust consultant and based on the

medical records supplied by Mr. Joy, he is not totally disabled. Mr. Joy's physician states he is

totally and permanently disabled, [sic] he has also been approved by Social Security." AR 68.

On February 4, 2010, the Plan's pension coordinator formally announced the committee's denial

of Joy's application, stating that based on the information submitted, the Committee "did not see

_____

[3] In fact, Joy had undergone anorectal manometry several weeks earlier with Dr. Lee.

[4] Interestingly, despite both doctor's opinions being titled an "Independent Medical Review," the Trust committee apparently described Dr. Freedman as "the trust physician" and Dr. Tawil as "the trust consultant."

consistent evidence . . . that would indicate Total and Permanent Disability if you can work in an office proximate to the restroom based on Dr. Lee's note of July 9, 2009." AR 2. The denial recapitulated the reviews of Dr. Freedman and Dr. Tawil, and concluded that "[i]f you can provide addition [sic] medical information which would satisfy the Trustees that you are totally and permanently disabled, then you would be entitled to Disability Retirement benefits under the Plan." AR 2.

**XI.    Appeal and Further Evidence**

Joy's attorney appealed the denial on June 10, 2010, reiterating that appeal and requesting review on July 19, 2010. AR 69, 142. On July 19, 2010, Joy's attorney provided the Plan with records from Clatsop Behavioral Healthcare, stating that the records showed Joy suffers from major depressive disorder, PTSD, intermittent explosive disorder, mood disorder, ADHD, and a history of multiple head traumas, and that these impairments, in combination with his physical impairments, render him disabled under the Plan. AR 142. Joy's attorney requested the record remain open for another 30 days to provide further documentation supporting Joy's application.

Two other submissions from Dr. Lee clarify the extent of Joy's incontinence during this period. First, on June 29, 2010, Dr. Lee verified that Joy had "postoperative incontinence" which was "contained and fairly mild, resulting in an inability to control liquid stool during flatulence." AR 421. Dr. Lee stated that Joy could minimize the impact of his condition by monitoring bowel movements, evacuating when the opportunity arises, adjusting his diet, using warm water enemas, and wearing diapers. *Id.* Overall, Dr. Lee opined that Joy's "limitations are primarily related to social embarrassment and his willingness to make mitigating adjustments relevant to his condition." *Id.* Also, on July 20, 2010, Dr. Lee submitted another statement

opining that Joy was "not able to return to his regular employment as a heavy equipment operator due to his rectal fecal incontinence condition." AR 268. Dr. Lee stated, however, that Joy "may be able to perform some type of work, but he will have to take frequent breaks to deal with his rectal fecal incontinence. Whatever type of employment he is able to perform will highly depend on: (1) the benevolence of his employer; and (2) the physicality of the job. The more physical the job, such as a heavy equipment operator, the more likely such employment will aggravate his rectal fecal incontinence condition and cause secretion of fecal material." *Id.*

## XII.    Vocational Analysis

The next month, on August 29, 2010, Joy underwent a vocational analysis with Richard Ross, a vocational evaluator, based on a records review as well as an interview and standardized testing. AR 275-276. Ross determined that although Joy's reasoning capacity was normal, his numerical ability was below normal limits and his clerical aptitude well below one standard deviation from the mean, suggesting a poor prognosis for any "job requiring even basic clerical activities." AR 276. Ross opined that, setting aside Joy's limitations from fecal incontinence, he had in theory the vocational capacity to "perform a very limited number of entry level occupations." *Id.* However, his skills and aptitudes limited him to mechanical and production occupations "that would not allow prophylactic management of his fecal incontinence." *Id.* Thus, when considering the combination of "the ramifications of the fecal incontinence," Joy's limited education, poor math skills, very poor clerical aptitude, and lack of computer skills, Joy had "no realistic probability to sustain competitive employment" in "any occupation, either full time or part time." *Id.* Ross even went so far as to say that engaging in services, vocational retraining, vocational counseling, or a job search was "futile" and that Joy was permanently and

Page 11 - FINDINGS AND RECOMMENDATION

totally disabled from gainful employment. *Id.* Joy provided Ross' report to the Plan on September 9, 2010. AR 278.

## XIII.  Plan's Response to Updated Evidence

Also on September 9, 2010, the Plan received another "Disability Determination" from Dr. Robert Sharpe, M.D., a Board Certified Psychiatrist. AR 427-429. Dr. Sharpe noted that Joy's case was reviewed and denied previously on "a request for disability coverage for fecal incontinence" and that the current reconsideration was to ascertain "whether the patient is disabled from a psychiatric standpoint." AR 428. Dr. Sharpe reviewed a number of medical records, Joy's March 2009 psychiatric evaluation, records from mental health providers, and a prior Independent Medical Review, but did not consider evidence prior to 2008, records after May 2010, or, of course, Ross' vocational evaluation. Dr. Sharpe opined that Joy did not have a severe and persistent mental illness meeting the requirements for total and permanent disability because: (1) he had no recent hospitalizations; (2) his diagnoses of ADHD, PTSD, and major depression were "not substantiated by the information in the psychiatric evaluation;" (3) Joy's examinations did not show "objective evidence of psychosis or suicidal/homicidal ideation" or "objective indication of impairments of memory or concentration;" (4) Joy was well groomed, showed up for appointments, and was able to follow through with minimal supervision; and (5) Joy was not under the care of a psychiatrist. AR 428.

## XIV.  Psychiatric Evaluation

Next, in late August and early October 2010, Joy underwent a two-session psychiatric examination with Dr. Ronald Turco, M.D., consisting of a review of medical, mental health, and vocational records, a clinical examination, mental status examination, developmental history, and

administration of the MMPI-2. AR 437-441. Because Joy was having "considerable difficulties concentrating and in maintaining any type of communication style for more than an hour or two," Dr. Turco split the examination into two separate sessions on different days. AR 437. Dr. Turco noted that Joy had been taking mood stabilizers – "essentially major psychotropic medications"– for a substantial amount of time, which interfere with his memory, concentration, and immediate and recent recall. AR 438. Moreover, Dr. Turco stated that the results of Joy's MMPI-2 test indicated Joy "experienced considerable difficulties with concentration, bizarre thought processes and essentially is expressing a very strong 'cry for help.'" AR 439. Dr. Turco diagnosed Joy with: Major depressive disorder, recurrent; PTSD; Attention deficit disorder with significant cognitive restriction; Intermittent Explosive disorder; and "Personality disorder associated with extreme anger and a tendency to suicidal ideation with may well be associated with a borderline personality disorder." AR 440. Dr. Turco opined that Joy was totally and permanently disabled due to a combination of his physical and cognitive problems:

> [Joy] has had ongoing significant problems dealing with his rectal/fecal incontinence and also with the difficulties associated with ongoing pain. The matter is complicated by the fact that he experiences significant cognitive deficits, meaning that he cannot concentrate for a very long period of time, has difficulty with regard to focusing and communicating and is substantially depressed and suicidal. Certainly with regard to the disability plan this man has been disabled from the very start of his injury. The multiple psychiatric and medical conditions have caused this disability.

AR 440-441.

## XV. Plan's Response to Updated Evidence

The Plan asked Dr. Sharpe to conduct an updated disability determination, this time providing more records, including the reports from Ross and Dr. Turco. AR 471-473. Dr. Sharpe briefly summarized Joy's previous mental health diagnoses, his medications (Straterra,

Page 13 - FINDINGS AND RECOMMENDATION

Seroquel, Prozac, Wellbutrin, Abilify), and Dr. Turco's diagnosis, but did not elaborate further on the nature of the newly presented evidence. Dr. Sharpe again focused only on the psychiatric aspect of Joy's condition, opining that "[t]he additional data reviewed does not substantiate that the patient meets plan requirements for total and permanent disability from the psychiatric standpoint." AR 472. Dr. Sharpe reasoned that: (1) Joy did not have evidence of psychosis; (2) Joy's suicidal tendencies were not substantiated; (3) Joy's history of violent acting out was not due to a severe and persistent mental illness, but was more likely related to a "characterological condition;" and (4) the abnormal findings on his mental status exam were not serious enough to impair him from working completely. AR 472.

## XVI.   Second Denial

On November 29, 2010, the same two members of the Committee again recommended denying Joy's application for disability retirement.[5] The Committee explained: "We recommend denial of this application for disability retirement benefits on the basis that the Trust physicians have stated that Mr. Joy is not totally and permanently disabled. Mr. Joy's physician states he is totally and permanently disabled. He has also been approved by Social Security."[6] AR 475. Approximately two weeks later, on December 14, 2010, the Plan's Pension Coordinator notified Joy that the Committee had denied his request for benefits because the Trustees "did not see consistent evidence in the records that would indicate Total and Permanent Disability." AR 5.

---

[5] Although Joy's attorney sought an appeal of the Committee's earlier decision, the form of Committee's November 29, 2010 denial makes no reference to that appeal, and instead reads like a decision on an entirely new application.

[6] Aside from a few minor changes in wording, it is nearly identical to the Committee's previous denial and makes no mention of the numerous documents Joy submitted to the Plan since that earlier denial.

Page 14 - FINDINGS AND RECOMMENDATION

The Coordinator recapitulated the reasoning of Dr. Sharpe, and stated that this was "a reconsideration" of Joy's earlier application limited to considering whether Joy was disabled "from a psychiatric standpoint." AR 6.

## XVII. Further Appeal and Response

On February 9, 2011, Joy's attorney appealed the Plan's denial, pointing out that the Plan "misconstrues the nature of Mr. Joy's disability, which is based on both physical and psychiatric impairments." AR 688.    Joy's counsel also provided an additional letter from Dr. Turco, in which he responds to Dr. Sharpe's last review finding Joy not disabled. AR 690-691.  Dr. Turco called Dr. Sharpe's conclusion "incredible" considering that Dr. Sharpe: (1) did not examine Joy, a "questionable ethical practice;" (2) did not consider the findings of Irene Holland, Joy's psychiatric nurse practitioner; (3) made no reference to the issues associated with Joy's physical problems, which "certainly contribute to the context of his psychiatric incapacity;" and (4) made no reference to the psychological testing performed by Dr. Turco or Dr. Birney.  AR 691.   Dr. Turco suggested that the Plan have a board certified psychiatrist actually examine Joy to determine whether he was disabled. *Id.*

On March 10, 2011, the Plan's Pension Representative notified Joy in a letter that his appeal would be presented to the full Board of Trustees for their review during their next meeting scheduled on April 26, 2011. AR. 694-695.  On April 20, 2011, Joy's attorney also provided the Plan with a copy of records from Dr. Darrel Brett, M.D., indicating Joy had recently undergone surgery to address issues of cervical spondylosis, disc disease, and nerve impingement, which involved implanting bone into Joy's spine. AR 913-915.

On May 4, 2011, the Plan's Pension Representative sent a letter informing Joy that his

application "has been through the Trust appeal process" and that since no additional medical

information had been received that substantiated Joy's claim of Total and Permanent Disability,

the claim had been closed. AR 7. The letter provided no further explanation of the Plan's

reasoning. Moreover, there is no evidence in the record indicating that the full Board of Trustees

actually considered Joy's appeal, as the March 10, 2011 letter from the Pension Representative

contemplated.

Joy initiated this lawsuit approximately one month later, on June 17, 2011. (Complaint,

#1.)

## LEGAL STANDARD

Under a traditional analysis, summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warren v. City of

Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995) (internal citation omitted). In an ERISA benefits

denial case where the district court applies an abuse of discretion standard and limits review to

the administrative record, "a motion for summary judgment is merely the conduit to bring the

legal question before the court." *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009)

(citing *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)). Thus, the "usual tests

of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."

*Id.* Where, however, the district court examines evidence outside of the administrative record, it

must apply the traditional rules of summary judgment and view the evidence in the light most

favorable to the non-moving party and deny summary judgment if it finds that evidence presents

a genuine dispute of material fact. *Id.*

//

# DISCUSSION

## I.    Standard of Review

### A.    Abuse of Discretion

"In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan during the claim period." *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011). Courts review an ERISA plan administrator's denial of benefits under an abuse of discretion standard if the "plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms." *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th Cir. 2008) (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc)). Here, the Plan provides "[t]he determination of a Participant's initial or continuing Total and Permanent Disability shall be at the sole discretion of the Trustees . . . ." (Taylor Decl., #10, Ex. 2 at 62.) This provision unambiguously grants the Plan Trustees discretion to construe the Plan's terms. As a result, I review the Plan's decision for abuse of discretion.

Under the ordinary abuse of discretion standard, the plan administrator's decision "is not arbitrary unless it is 'not grounded on any reasonable basis.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011) (quoting *Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1417 (9th Cir.1991)). This "any reasonable basis" test is generally applied, except when a plan administrator operates under a structural conflict of interest, in which case the court must determine whether the administrator's decision "is reasonable." *Id.* at 673, 675. Under either form of the abuse of discretion standard, the court considers whether the administrator's denial of benefits was "(1) illogical, (2) implausible, or (3) without support in

inferences that may be drawn from the facts in the record."[7] *Id.* at 676 (internal quotations omitted).

### B.    Conflict of Interest

In general, a conflict of interest exists where an ERISA plan administrator "both funds the plan and evaluates the claims." *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008); *Abatie*, 458 F.3d at 967 ("We have held that an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest.")  If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115  (1989)).  A court must therefore "temper the abuse of discretion standard with skepticism 'commensurate' with the conflict." *Nolan*, 551 F.3d at 1153 (citing *Abatie*, 458 F.3d at 959, 965, 969).

Joy argues that there is a conflict of interest here for two reasons.  First, Joy relies on *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1026 (9th Cir. 2008) for the notion that a structural conflict exists, since the employer Trustees who administer the Plan have an intrinsic interest in denying benefits to preserve the Trust corpus, which the employer

---

[7] For example, in *Salomaa*, admittedly a case where a structural conflict existed, the Ninth Circuit held that the plan administrator's decision was illogical, implausible, and without support in inferences that could reasonably be drawn from facts in the record, because: (1) every doctor who personally examined Salomaa concluded that he was disabled; (2) the plan administrator demanded objective tests to establish the existence of a condition for which there are no objective tests; (3) the administrator failed to consider the Social Security disability award; (4) the reasons for denial shifted as they were refuted, were largely unsupported by the medical file, and only the denial stayed constant; and (5) the plan administrator failed to engage in the required "meaningful dialogue" with Salomaa. *Id.*

funds.   Second, Joy argues that Trustee's procedural violations in handling Joy's claims indicate

the presence of a conflict of interest in this case.   The Plan counters that the Ninth Circuit has

held no conflict of interest exists where, as here, participating employers fund a multi-employer

trust that is administered by a board of trustees consisting of both employer and employee

members.   *See Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*, 588 F.3d

641, 648 (9th Cir. 2009).   In *Anderson*, the Ninth Circuit indeed held that where a multi-

employer benefit trust funded by employers is administered by a Board of Trustees consisting of

employer and employee members, no conflict exists because "[b]oth sides are at the table."[8]

*Anderson*, 588 F.3d at 648 (citing *Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480,

481 (9th Cir.1990)).   Thus, the nature of the Plan's administration by a Board of Trustees

representing both employers and employees does not create a structural conflict of interest.

Moreover, I agree with the Plan that an administrator's commission of procedural errors

does not technically create a conflict of interest, although that distinction is academic.   It is true

that gross procedural violations of ERISA by a plan administrator affect the court's review,

changing the standard of review from abuse of discretion to *de novo*.   *Anderson*, 588 F.3d at 647

---

[8] I note, however, that the Second Circuit has strongly criticized the Ninth Circuit's
holding in *Anderson*, stating that it "rests on a shaky foundation" and is unique in its conclusion.
*Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 n.5 (2d Cir. 2010) ("[*Anderson*]
held that a § 186 fund is not conflicted for two reasons: [1] because it is, by definition, a
multi-employer trust in which the trustees do not have a personal interest, and [2] because
evaluations must be made by a balanced board. 588 F.3d at 648. But the first reason was contrary
to the Ninth Circuit's earlier post- Glenn decision in [*Burke*], which held that "even when a plan's
benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a
factor in determining whether there was an abuse of discretion." And the Anderson court's
support for its second reason was a citation to *Jones v. Laborers Health & Welfare Trust Fund*,
906 F.2d 480 (9th Cir.1990), a pre- Glenn decision"). Nevertheless, I must adhere to the Ninth
Circuit's position in *Anderson*, however flawed.

("Even if a plan grants discretion to the administrator, the standard of review shifts to de novo if the administrator engages in 'wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well.'") (quoting *Abatie*, 458 F.3d at 963.) I find no cases stating that an administrator's procedural error that does not rise to this level indicates the existence of a conflict of interest. Nevertheless, even an administrator's procedural violation of ERISA that does not cause the court to switch its standard of review can still effect the outcome of the abuse of discretion analysis, much like the presence of a structural conflict. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 674 (9th Cir. 2011) (quoting *Abatie*, 458 F.3d at 972) (like a conflict of interest, "[p]rocedural errors by the administrator are also 'weighed in deciding whether the administrator's decision was an abuse of discretion'"). Accordingly, although no structural conflict of interest exists in this case, I weigh any of the Plan's procedural violations of ERISA alongside other evidence in my abuse of discretion review.

### C.    Review of Plan's Decision

Here, I organize Joy's arguments into those relating to the Plan's procedural violations of ERISA and those pertaining to the alleged unreasonableness of the Plan's decision. Although this separation is hardly hermetic, it is useful to focus discussion of the many facts and arguments in this case. Joy contends that the Plan violated ERISA procedures by: (1) failing to have that review conducted by different individuals than those who decided the original determination as required under 29 C.F.R. § 2560.503-1(h)(3)(ii); (2) failing to provide a "full and fair review" of his original claim denial as required under 29 C.F.R. § 2560.503-1(h)(2)(iv); and (3) failing to engage in what the courts call "meaningful dialogue" with Joy as required under 29 C.F.R. §

Page 20 - FINDINGS AND RECOMMENDATION

2560.503-1(f).  In addition to these procedural flaws, Joy argues that the Plan's decision was

substantively illogical, implausible, and without support in the record because: (1) the Plan

ignored the opinions of experts and medical providers who actually examined Joy; (2) the Plan

relied exclusively on conclusory and incomplete opinions of biased medical consultants;  (3) the

Plan failed to consider Joy's Social Security disability award; and (4) the Plan failed to call for an

independent medical examination of Joy.[9]  Although I do not agree completely with all of Joy's

contentions, I find that the Plan committed several procedural violations that warrant a higher

degree of skepticism of the Plan's decisions.  Whether or not I apply heightened skepticism to the

Plan's decision, I would also find that the Plan made substantive errors in its decision such that it

had no reasonable basis to deny Joy disability retirement benefits.  Finally, the Plan's revelation

on the eve of oral argument in this case that the Board of Trustees never actually considered

Joy's appeal before the Plan issued a negative final decision strengthens by conviction that the

Plan abused its discretion in this case.  (Memo. in Supp. of Mot. to Correct Summary Judgment

Record and Stay Proceedings, #30, at 2.)

      1.      **Procedural Errors**

          a.      **Different Reviewer**

      29 C.F.R. § 2560.503-1(h)(3)(ii) states that an ERISA plan must provide for a

review of disability benefit determinations "conducted by an appropriate named fiduciary of the

plan who is neither the individual who made the adverse benefit determination ... nor the

subordinate of such individual." *Anderson*, 588 at 647.  Joy contends that the Plan violated this

---

[9] Joy also raises other arguments in passing which need not be addressed here, such as
that the Plan failed to consider the affidavit he submitted and treated him as an "adversary" in the
claims process.

Page 21 - FINDINGS AND RECOMMENDATION

requirement by allowing the same two Trustees who initially denied his application– Mark

Holliday and Charles Valentine – to also evaluate his appeals.   The Plan argues that it complied

with ERISA, since the two denials by Holliday and Valentine were actually denials of initial

claims, one for fecal incontinence and one for a combination of physical and cognitive

conditions.  The Plan also initially proposed but then retracted the argument that the final denial

upon review of Joy's second claim was properly performed by the entire Board of Trustees, not

just Holliday and Valentine.

        The Plan's interpretation misconstrues the record.  Joy completed a single application for

disability benefits.  After Holliday and Valentine initially denied that claim, Joy gave a notice of

appeal and sought "further appeal of the denial" of his application in light of his additional

mental disorder.  AR 142.  The Plan, however, apparently treated that request for review as an

entirely new claim, and improperly permitted Holliday and Valentine to decide it instead of

having the review conducted by a different individual.  Moreover, even if Joy's request for

review was properly treated as a new claim, the record does not indicate who evaluated Joy's

appeal of *that* claim.  The record nowhere states that the full Board of Trustees made that final

determination on review.  Instead, the actual letter from Cornelia Taylor, the Pension

Representative, does not state that the full Board of Trustees reviewed and denied Joy's appeal; it

merely indicates that Joy's "file has been through the Trust appeal process" without indicating

who performed the review.  AR 3.  Therefore, the Plan violated the ERISA requirement that a

different individual review claim denials.

### b.    Full and Fair Review

        ERISA regulations also require a plan to conduct a "full and fair review" of claims, which

includes "tak[ing] into account" all evidence submitted by the claimant. *See* 29 C.F.R. §
2560.503-1(h)(2) ("the claims procedures of a plan will not be deemed to provide a claimant with
a reasonable opportunity for a full and fair review of a claim and adverse benefit determination
unless the claims procedures– . . . (iv) Provide for a review that takes into account all comments,
documents, records, and other information submitted by the claimant relating to the claim,
without regard to whether such information was submitted or considered in the initial benefit
determination."). In general, Joy contends that the Plan did not conduct a full and fair review
here because it considered his disabling conditions piecemeal, instead of in combination, and
because it simply ignored– without comment– the overwhelming evidence Joy submitted
indicating his total and permanent disability. I agree with both of these critiques.

    In this section of the analysis, I decline to conduct an exhaustive review addressing every
piece of allegedly ignored evidence, since I intend only to demonstrate that ERISA procedures
were violated. To the extent that my later discussion describes other aspects of the Plan's failure
to review, address or otherwise take into account evidence favorable to Joy, those aspects also
reinforce my conclusion that the Plan violated ERISA procedures. Two areas in particular serve
to demonstrate how the Plan denied Joy a full and fair review.

    First, the Plan's evaluation and resulting denials explicitly treat Joy's conditions
separately without considering their combined effects. The Plan's first denial dealt
predominantly with allegations of fecal incontinence, except for a brief rebuttal of the letter from
Joy's counselor. By contrast, the second denial dealt only with Joy's psychiatric conditions,
despite Joy's continued insistence that he suffered a combination of impairments making work
impossible. This reductive approach cannot not satisfy the "full and fair review" requirement.

Second, the Plan failed to "take into account" several major aspects of evidence supporting Joy's claim, even though the Plan's medical expert reviews and decision letters inevitably prefaced their conclusions with phrases such as "based on the information in the record." For example, the Plan never once discussed the findings of vocational evaluator Richard Ross who conducted standardized testing of Joy's aptitudes and opined that based on the combination of Joy's incontinence, concentration deficits, and poor skills, he could not obtain any competitive employment. The fact that the Plan ignored the *only* piece of vocational evidence in the record alone seems sufficient to find that the review process was not "full and fair." Another example is the Plan's experts' failure to comment on or explain away the significance of the results of Dr. Turco's MMPI-2 testing, which showed Joy's "considerable difficulties with concentration" and "bizarre thought processes." This is especially concerning, given that Dr. Turco's MMPI-2 again appears to be the *only* formalized psychological battery administered to Joy described in the record. In sum, the Plan's review procedure that separated analysis of Joy's mental limitations from analysis of his physical limitations and failed to take into account expert opinions based on objective evaluations cannot be "full and fair" as ERISA requires.

### c.    Meaningful Dialogue

Finally, an ERISA plan must "provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or

Page 24 - FINDINGS AND RECOMMENDATION

information is necessary; and (4) Appropriate information as to the steps to be taken if the

participant or beneficiary wishes to submit his or her claim for review." 29 C.F.R. §

2560.503-1(f). The Ninth Circuit has described this regulation as requiring "a meaningful

dialogue between ERISA plan administrators and their beneficiaries." *Booton v. Lockheed Med.*

*Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir.1997). As the Ninth Circuit recently explained:

> where the denials were based on absence of some sort of medical evidence or
> explanation, that the administrator was obligated to say in plain language what additional
> evidence it needed and what questions it needed answered in time so that the additional
> material could be provided. An administrator does not do its duty under the statute and
> regulations by saying merely "we are not persuaded" or "your evidence is insufficient."

*Salomaa*, 642 F.3d at 680.

Here, the Plan's denial letters critiqued some limited aspects of the evidence submitted by

Joy. But the first denial letter closes with the following cryptic instruction – "[i]f you can

provide addition [sic] medical information which would satisfy the Trustees that you are totally

and permanently disabled, then you would be entitled to Disability Retirement benefits under the

Plan." AR 2. This instruction does nothing to identify for Joy what additional evidence would

be needed to demonstrate his eligibility and amounts to the type of "your evidence is insufficient"

statement that the courts do not permit. The second denial letter does not even go that far, stating

only that "[b]ased on the information contained in the submitted records, there is no indication

that Mr. Joy was suffering from a mental disorder that impaired his mental status to the point of

being incapable of any regular employment or substantially gainful occupation . . . ." AR 6.

Considering the presence of at least one opinion in the record that explicitly found Joy suffered

mental disorders that prevented him from gainful employment– Dr. Turco's report– this cursory

justification provided Joy no useful guidance on what further evidence might be required.

Consequently, the Plan also violated ERISA's procedural requirement for meaningful dialogue between the plan administrator and beneficiary.

### d.    Impact of Procedural Errors

I weigh the above procedural errors along with my consideration of the Plan's decision, in a manner similar to a court's additional consideration of a structural conflict of interest. *See Abatie*, 458 F.3d at 972. In *Abatie*, the Ninth Circuit instructed that, in weighing a conflict of interest, the court's discretionary review must be "informed by the nature, extent, and effect" that conflict may have had "on the decision-making process." *Abatie,* 458 F.3d at 967. I apply the same analysis here regarding the Plan's procedural violations. Although the procedural violations were not so extreme as to require a *de novo* review, they are substantial, given that the Plan ignored the fundamental aspect of due process requiring an appeal to be considered by a different decision-maker and addressed only a subset of evidence submitted, virtually ignoring the opinions most favorable to Joy. Like a structural conflict of interest, these procedural violations "may have tainted the entire administrative decisionmaking process," and I therefore review the Plan's "stated bases for its decision with enhanced skepticism." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009).

### 2.    Substantive Errors

#### a.    Plan Ignored the Opinions of Joy's Experts and Medical Providers

The gravamen of Joy's motion for summary judgment is that the Plan diminished, ignored or completely disregarded the overwhelmingly credible evidence he presented showing his total and permanent disability. While a detailed analysis of the entire record is impractical, I

focus on major aspects of the record that Joy contends demonstrate his disability, and on the Plan's justifications for failing to credit them.

The Supreme Court has held that "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). At the same time, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Although the plan administrator has no absolute burden of explanation, the Ninth Circuit acknowledges that "complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process." *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009) (internal quotation omitted). Finally, if the court is conducting an abuse of discretion rather than a de novo review, a plan cannot make up for a lack of explanation in the original denial by relying on new justifications first presented in litigation. *See Jebian v. Hewlett–Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1104 -1106 (9th Cir. 2003) ("a contrary rule would allow claimants, who are entitled to sue once a claim had been 'deemed denied,' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced"); *see also Kurchack v. Life Ins. Co. of N. Am.*, No. CV–09–1766–PHX–GMS, 2011 WL 3586068, at *3 (D. Ariz. Aug. 16, 2011).

Focusing for a moment on the Plan's second denial dated December 14, 2010, it is clear that the Plan disregarded much of the evidence of Joy's disability that was contrary to its own

medical examiners' conclusions "without so much as an explanation." *Montour*, 588 F.3d at

635. In justifying its denial, the Plan essentially reasoned that Joy was not disabled because: (1)

Joy's mental health treatment was limited to "individual and group therapies along with

medication management," but did not include "the care of a psychiatrist or other physician"; (2)

Joy's evaluation lacked an Axis II diagnosis, despite that he exhibited symptoms indicating one;

and (3) Joy's diagnoses of ADHD, PTSD, and major depression were not substantiated. AR 5-6.

　　None of these explanations provide a reasonable basis for the Plan's decision. First, the

Plan's focus on the lack of treatment by a "psychiatrist" or "other physician" is disingenuous and

irrational. Joy was treated consistently by Irene Holland, a psychiatric nurse practitioner, who

recommended a combination of medication management and therapy, from at least March 2009

until May 2010, when mental health records end. AR 146, 161, 163, 165, 167, 169, 171,174,

176, 178, 180, 182, 184, 186, 188, 190. The Plan completely ignores this psychiatric treatment

and offers no rational explanation why such treatment by a psychiatric nurse practitioner would

differ so substantially from that of a psychiatrist. Second, I agree with Joy that the Plan's

reliance on the lack of Axis II diagnosis is nonsensical. Dr. Turco diagnosed Joy with an Axis II

personality disorder. AR 440. Even so, Dr. Turco's conclusion that Joy was disabled does not

necessarily rely on that aspect of his mental illness, focusing instead on the combination of his

incontinence, cognitive deficits and depression. Third, the Plan's conclusion (adopted from Dr.

Sharpe) that Joy's diagnoses of ADHD, PTSD, and major depression were unsubstantiated

merely begs the question. Without any explanation by Dr. Sharpe for that broad statement, it is

impossible to determine if his opinion is indeed credible, and thus a permissible ground for

rejecting Joy's conflicting medical evidence. Furthermore, even if Joy's ADHD, PTSD, and

Page 28 - FINDINGS AND RECOMMENDATION

depression were unproven, the Plan and Dr. Sharpe ignored Joy's other diagnosis of intermittent explosive disorder, shared by both nurse practitioner Holland and Dr. Turco. Of course, as I discussed previously, the Plan's reasoning also dismissed without any explanation whatsoever the combined effects of Joy's psychiatric and physical conditions, which are well-covered in the record, and the vocational evidence describing the practical consequence of that combination.

The Plan's first denial suffers from similar defects. The Plan's explanation for its denial is quite short, essentially asserting that: (1) Joy's incontinence is minor, only requiring proximity to a bathroom, as described by Dr. Lee ; and (2) any worsening of Joy's psychological conditions due to denial of disability is not an "intrinsic" change in his mental health and does not alter the Plan's conclusion that Joy was not disabled. AR 2. First, the Plan's explanation, again recapitulating Dr. Freedman's opinions, unreasonably misconstrue's Dr. Lee's July 2009 progress note. In fact, Dr. Lee never stated that Joy's incontinence could be controlled by being close to a bathroom. AR 396. This makes sense, given that Joy reported to Dr. Lee that he had "no sensation of needing to pass stool" and his incontinence occurred "without any warning." Id. Moreover, the Plan failed to address Dr. Lee's October 9, 2009 opinion that Joy was totally and permanently disabled by his incontinence, apparently because it did not provide that opinion to Dr. Freedman. Second, while Nutt's letter does not explicitly opine that Joy meets the Plan's definition of total and permanent disability, Nutt references both Joy's physical limitations and his "anxiety and depression" and the effects of the Plan's withholding of benefits, including "emotional and corresponding physical damage" and the exacerbation of "his physical and mental health issues." AR 62. Further, the Plan's dismissal of Joy's mental health concerns because they "did not substantially change the prior determination"– ostensibly referring to Dr.

Freedman's analysis of Dr. Lee's progress note concerning incontinence – is illogical.  Dr. Freedman initially only commented on Joy's incontinence, not his psychological conditions. Thus, even if the Plan correctly disregarded any temporary worsening of Joy's mental health because it was not "intrinsic," the Plan had no basis to conclude that Joy's underlying anxiety and depression did not contribute to his inability to work.

In briefing, the Plan contends that it properly considered all of Joy's evidence in denying benefits for several reasons.  First, I am completely unpersuaded by the Plan's argument that because the Plan's experts stated that they reviewed certain records in reaching their conclusions, the Plan "considered" Joy's physical and mental limitations, and their effect in combination on his vocational capacity.  When the experts' ultimate conclusions fail to acknowledge, address, or refute significant contrary evidence, the Plan's determination cannot be said to be "the product of a principled and deliberative reasoning process." *Montour,* 588 F.3d at 635.

Second, I reject the Plan's many post-hoc justifications for its determination which it has raised for the first time in this litigation.  For example, the Plan contends: that Joy's documentation contained changing and conflicting mental health diagnoses; that Joy's pre-2008 medical conditions are irrelevant because they preexisted his July 2009 benefits applications and never prevented him from working in the past; that Joy admitted the capacity to engage in gainful employment when he told Dr. Bascom that he now "only does jobs where he is not around the [sic] people" due to his embarrassment; that Joy's Global Assessment Functioning (GAF) score varied and was, in any case, not determinative of his disability; that Dr. Birney's mental status evaluation contained many observations suggesting that Joy was not disabled; and that Dr. Lee's various statements concerning how Joy could improve and manage his incontinence undercut the

notion that Joy is disabled.  The Plan never proposed these rationales in a manner that would

have allowed Joy to respond to them and I decline to permit the Plan to rely on them now.[10]

> **b.      Plan Relied Exclusively on Incomplete Opinions of Biased**
>
> **Medical Consultants**

Joy next argues that the Plan relied only on its own biased medical consultants.  This

argument is, for the most part, duplicative of Joy's earlier contention.  If the Plan improperly

ignored the opinions of Joy's experts and treating physicians, which conflicted with those of the

Plan's consultants, it follows that the Plan's reliance on the consultants' opinions was also

improper.  I do, however, wish to address Joy's contention that medical consultants upon which

the Plan relied were not truly independent.  Joy repeatedly calls these consultants "in-house"

rather than independent reviewers, in part based on the notation in Dr. Freedman's first review

indicating that the type of review requested was "In House Review Disability Determination."

AR 41.  There is no evidence in the record concerning the frequency with which the Plan utilizes

the services of AllMed or its consulting physicians and the court does not base its decision on the

single ambiguous notation in Dr. Freedman's initial report.  Rather, I have examined the bases of

the Plan's decision, which recapitulate the opinions of their AllMed consultants, and have found

them to be illogical, implausible, and unsupported by the record.

---

[10] Many of these arguments are also unpersuasive.  Plaintiff addresses them extensively in his reply brief and I do not repeat his reasoning here.  (P.'s Reply Br., #28, at 10-18.)  I feel compelled, however, to respond to the argument concerning Dr. Lee's statements which demonstrates the Plan's continued mischaracterization of the nature of Joy's conditions.  As Richard Ross and Dr. Turco point out, Dr. Lee's statements concerning the effect of Joy's incontinence must be considered in the context of his mental health and vocational limitations.  It would be unreasonable to conclude that Joy is not disabled merely because management of his incontinence theoretically might permit him to perform a menial office job, when his lack of skills and cognitive limitations prevent him from obtaining and keeping such a position.

c.    **Plan Failed to Consider Joy's Social Security Disability Award**

Joy also contends that the Plan abused its discretion by either failing to consider Joy's Social Security award, failing to explain why that award did not indicate Joy was disabled under the plan, or failing to identify additional information Joy could provide from the Social Security file to assist the Plan's determination. Several Ninth Circuit cases find that a plan administrator's failure to distinguish a contrary Social Security determination calls into question the reasonableness of its decision. *Salomma*, 642 F.3d at 679 ("Evidence of a Social Security award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion"); *Montour*, 588 F.3d at 635 ("not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence"). Here, the Trustees who made the two recommendations of denial stated that Joy had received a Social Security Disability award, but made no attempt to distinguish their finding under the Plan from Social Security's analysis. Nor did they identify any documents in the Social Security file that would have been helpful to evaluate the impact of the Social Security award. Further, the actual denial letters from the Plan made no mention of Joy's Social Security award whatsoever, just as in *Salomma*. Accordingly, I agree that the Plan's failure to distinguish the Social Security award further indicates the illogical and unreasonable nature of the Plan's determination.

d.    **Plan Failed to Conduct an Independent Medical Examination**

Joy also argues the Plan's failure to call for an in-person independent medical examination signals the Plan's abuse of discretion, especially where the Plan permits such an examination. Where courts review a Plan's denial under the abuse of discretion standard with

Page 32 - FINDINGS AND RECOMMENDATION

heightened scrutiny, the Plan's choice not to conduct a physical examination can be another factor suggesting the Plan acted unreasonably. *See Salomaa*, 642 F.3d at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits. The skepticism we are required to apply because of the plan's conflict of interests requires us to consider this possibility in this case. The medical record by physicians who actually examined Salomaa is entirely one sided in favor of Salomaa's claim. The plan rejected its opportunity to see if there was another side.").

Here, several doctors or evaluators who actually examined Joy in person opined that he was disabled, including Dr. Lee, Dr. Turco, and Richard Ross. Dr. Turco went so far as to write to the Plan a second time, calling its denial of benefits "incredible," urging it to conduct an in-person examination, and raising the prospect that its medical consultant acted unethically by rendering an opinion based only a records review. And, although Dr. Birney did not go so far as to declare Joy disabled, the Social Security Administration, which requested Dr. Birney's evaluation, ultimately did. Finally, as discussed at length above, the record reviews conducted in this case were not so thorough as to obviate the need for an in-person examination. The facts here are not quite as stark as in *Salomaa*, where four physicians and two psychologists uniformly declared the plaintiff disabled, "often in dramatic language." 642 F.3d at 676. Nevertheless, in light of the procedural violations which occurred here and the consensus of Joy's treating and examining sources that Joy was disabled, the Plan's failure to engage an independent medical examiner suggests a further abuse of discretion.

### 3.    Plan Failed to Consider Appeal

Finally, just days before oral argument in this case, the Plan sought leave to correct the summary judgment record and stay these proceedings, after determining that the Board of Trustees never considered Joy's appeal, as the Plan argued in its summary judgment briefing.[11] Indeed, the record provides no proof that any of the Board of Trustees, let alone the full Board, considered Joy's appeal prior to the Plan's final denial letter. This shocking oversight represents the epitome of both procedural and substantive error. The Plan's final decision was not based on a "full and fair" review as required by ERISA; it was based on no review at all. Similarly, the Plan's automatic final denial was the definition of "illogical," "implausible," and "without support in inferences that may be drawn from the facts in the record," and thus failed to satisfy the "any reasonable basis" test for abuse of discretion review. *Salomaa*, 642 F.3d at 673, 676. Even apart from the procedural and substantive violations described at length above, I would find the Plan to have abused its discretion on the basis of this error alone.

In sum, this court finds that the Plan committed numerous procedural and substantive violations of its obligations under ERISA. The administrative record presents sufficient evidence showing that Joy meets the Plan's requirements for disability retirement benefits. He is totally and permanently disabled by a combination of permanent physical conditions and mental disorders which have existed for more than six consecutive months and render him incapable of any substantially gainful employment or occupation.

//

//

---

[11] The Plan effectively abandoned that motion, when, instead of presenting supplemental authority showing why a stay of proceedings and remand was appropriate, the Plan asked the court to decide the summary judgment motions on the basis of the current briefing and argument.

Page 34 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment (#14) should be granted, defendant's motion for summary judgment (#16) should be denied, and judgment should be entered accordingly.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 24th day of April, 2012.

Honorable Paul Papak
United States Magistrate Judge